# UNITED STATES BANKRUPTCY COURT
## FOR THE
## DISTRICT OF MASSACHUSETTS

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

In re

**PETER L. BRANDT**,                                        Chapter 13
                                                           Case No. 15-12457-JNF
      Debtor
~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

**WILLIAM GAZZOLA**,
      Plaintiff,
v.                                                         Adv. P. No. 15-1166

**PETER L. BRANDT**,
      Defendant

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

## MEMORANDUM

## I.    INTRODUCTION

The matter before the Court is the two-count First Amended Complaint filed by

William Gazzola ("Gazzola")[1] against the Chapter 13 debtor, Peter L. Brandt ("Brandt"

or the "Debtor"), through which Gazzola seeks a determination that the debt owed to

him by Brandt should be excepted from discharge pursuant to 11 U.S.C. § 523(a)(2)(A)

(Count I) and (a)(4) (Count II).  The dispute between the parties arose from Gazzola's

delivery, in 2001, of two vintage automobiles to Brandt who agreed to perform restoration

work on one of them in exchange for title to the other, plus an additional cash payment.

---

[1] Gazzola's name was incorrectly spelled in the Complaint as "Gazolla."

The parties filed a Joint Pretrial Memorandum on May 6, 2016, in which they agreed to certain facts and listed the Debtor as a witness to be called at trial. The Court conducted a trial on January 11, 2017, at which only one witness, Gazzola, testified and 14 agreed upon exhibits were introduced into evidence. The Debtor was present at trial but did not testify in his own defense, nor was he called by Gazzola. Following the trial, the Court took the matter under advisement, and both parties submitted Requests for Findings of Fact and Conclusions of Law on January 31, 2017.

The Court has jurisdiction in this proceeding pursuant to 28 U.S.C. § 1334(a) and (b) and the order of reference from the United States District Court for the District of Massachusetts. *See* LR, D. Mass. 201. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I). The Court now makes the following findings of fact and conclusions of law pursuant to Fed. R. Bankr. P. 7052. For the reasons set forth below, the Court finds that Gazzola has sustained his burden of proving an exception to discharge for the debt owed to him by the Debtor pursuant to 11 U.S.C. § 523(a)(4) and shall enter judgment in his favor.

## II.    PROCEDURAL BACKGROUND

The Debtor filed a petition under Chapter 13 of the Bankruptcy Code on June 22, 2015, listing his address as 217 Underpass Road, Brewster, Massachusetts ("217 Underpass Road"). One month later, on July 22, 2015, the Debtor filed his Schedules and Statement of Financial Affairs. On Schedule A – Real Property, the Debtor listed no real property. On Schedule B – Personal Property, in response to Question 19 "[e]quitable or future interest[s]," he stated that Grosse Scheisse Realty Trust is the owner of the property

located at 217 Underpass Road.   On Schedule F – Creditors Holding Unsecured Nonpriority Claims, he listed Gazzola as the holder of a claim in the amount of $45,000 arising from a judgment; he failed to list the claim as either contingent or disputed.   On his Schedule I – Your Income, the Debtor listed his occupation as "Auto repair and restoration" d/b/a Euro Classics in Brewster, Massachusetts.   On his Statement of Financial Affairs ("SOFA"), the Debtor listed Euro Classics, with an address of 217 Underpass Road, as his business in response to Question 18.   In response to Question 4 regarding suits and administrative proceedings, the Debtor listed a supplementary process proceeding entitled [*Gazzola*] *v. Brandt*, 1326 SP 00104, pending in the Orleans District Court, Department of the Massachusetts Trial Court.   In response to Question 5 on the SOFA entitled, "Repossessions, foreclosures and returns," the Debtor listed Gazzola as having effected a sheriff's sale of 215 Underpass Road, Brewster, Massachusetts ("215 Underpass Road") on November 18, 2014, at which time that property was sold to Kevin Benger, as trustee, for $6,000.   According to the SOFA, the value of 215 Underpass Road at the time of sale was $200,000, and the property was encumbered by two mortgages totaling $195,000.

On September 22, 2015, Gazzola timely filed a one count complaint against the Debtor through which he sought an exception to the Debtor's discharge pursuant to 11 U.S.C. § 523(a)(6).   On October 16, 2015, Gazzola filed a proof of claim asserting an amount owed of $52,627.97, based upon "Judgment (Fraud, Embezzlement, Willful PI)" (the "Claim").   In support of the Claim, Gazzola attached to it a complaint filed on August 17, 2010 in the Orleans District Court in a matter entitled *William Gazzola v. Peter L. Brandt*

*d/b/a Euro Classics Automobiles*, Docket 1026-CV-0481 (the "state court action") and a

Memorandum of Decision and Order for Judgment issued by the District Court (Merrick,

J.) on September 13, 2012 (the "Memorandum and Judgment") through which the District

Court, *inter alia*, entered judgment in favor of Gazzola against Brandt d/b/a/ Euro-

Classics Automobiles "in the amount of $8,000.00, trebled to $24,000.00 plus interest from

the date of this action, attorney's fees in the amount of $12,600 and costs."  Gazzola also

attached to the Claim an "Execution on Money Judgment" issued in the state court action

on September 27, 2012, in the amount of $42,971.06 (the "execution").[2]  Lastly, Gazzola

attached an "Itemization of Interest, Charges and Credits" to the Claim which reflects

how he arrived at the Claim amount by adjusting the execution for accrued postjudment

interest through the date of the filing of the Claim (+$15,738) and for receipt of the

"Sheriff's Sale Credit" (-$6,000).[3]  No party objected to Gazzola's Claim.

On November 12, 2015, Gazzola filed the First Amended Complaint (hereinafter,

the "Complaint").  As discussed above, the Complaint contained two counts through

which Gazzola seeks an exception to the Debtor's discharge for the debt owed to him in

the amount of $52,627.97, the face amount of the Claim, pursuant to 11 U.S.C. §

523(a)(2)(A) and (a)(4).  Gazzola omitted the previously asserted count under § 523(a)(6)

as debts of the kind set forth in 11 U.S.C. § 523(a)(6) are discharged in Chapter 13.  *See* 11

---

[2] Based upon evidence introduced at trial, it appears that the amount of the execution
includes amounts for prejudgment and postjudgment interest, attorney's fees and costs.
*See* Exhibit 10.

[3] There is a discrepancy of $81.09 between the face amount of the Claim ($52,627.97) and
the total amount set forth in the Itemization ($52,709.06).

4

U.S.C. § 1328(a)(2).[4]  The Debtor answered the Complaint on November 17, 2015 and asserted no counterclaims.  The Court issued a Pretrial Order two days later, on November 19, 2015.

On April 15, 2016, Gazzola filed a motion for summary judgment with respect to both counts in the Complaint.  Relying on principles of collateral estoppel, he argued that the Memorandum and Judgment warranted summary judgment in his favor.  The Debtor opposed the motion.  The Court held a hearing on the motion for summary judgment on June 17, 2016.  In denying the motion for summary judgment, the Court ruled that the Memorandum and Judgment did not establish all the elements of the exceptions to discharge set forth in 11 U.S.C. § 523(a)(2)(A) and (a)(4).

On July 11, 2016, the Court confirmed the Debtor's Second Amended Chapter 13 Plan which provides for a dividend of not less than 2% to holders of general unsecured claims, which total $283,094.84, over the 57 month term of the plan.

## III.   FINDINGS OF FACT

Gazzola, a retired public school teacher who resides in Connecticut, has had a lifelong interest in repairing and maintaining vintage automobiles.  He testified that he

---

[4] The parties filed a Stipulation on October 16, 2015 which provided that Gazzola would file an amended complaint by November 13, 2015 and that the Debtor would file a responsive pleading by December 4, 2015.  Accordingly, the Debtor has waived any argument that the Complaint, which was filed after the original deadline to file a complaint seeking an exception to discharge, is untimely.  *See* Fed. R. Bankr. P. 4007 and Kontrick v. Ryan, 540 U.S. 443, 459-60, 124 S. Ct. 906 (2004) (holding that Fed. R. Bankr. P. 4004(a)—a rule that is analogous to Fed. R. Bankr. P. 4007 in that it sets a time limit for filing a complaint objecting to discharge under § 727(a)—is not jurisdictional and can be waived if the debtor does not raise the untimeliness of the complaint before the bankruptcy court hears the merits of the objection to discharge).

has purchased numerous used autos, including six Porsches, and has developed an expertise in performing work on them over a period of 50 years. He would bring the cars into good working order, register them and drive them for a period of time before selling them for "something a little better." He described Porsches as exotic cars requiring very expensive parts that are difficult to obtain. He testified that he researched various publications and internet resources to learn how to repair and maintain Porsches. In 1984, he purchased, for approximately $6,000, a 1959 Porsche, Convertible D (the "'59 Porsche"), which was in need of restoration. He purchased numerous parts for that car and conservatively ascribed a $15,000 current value for them. He insured that car, from 2001 through 2012, at a value of $30,000. In 2014, he sold the '59 Porsche for $38,500.

In 1992, Gazzola purchased his sixth Porsche, a 1962 Porsche 356B coupe (the "'62 Porsche") for $6,000, which he insured for $10,000. He testified that he purchased numerous parts for the '62 Porsche for approximately $2,500, which have a current value of between $6,000 and $8,000.

Gazzola testified that in 2001 he placed an advertisement in the Cape Cod Times newspaper offering the '62 Porsche for a sale price of $8,000. According to Gazzola, Brandt responded to the ad in February 2001. Gazzola testified that he discussed with Brandt his reason for selling the '62 Porsche, namely that he was trying to raise funds to restore the '59 Porsche. Gazzola stated that Brandt visited him in Connecticut a few weeks later to inspect both vehicles and produced a number of photographs of a car Brandt had restored which, Gazzola concluded, "demonstrated a pretty complete restoration process." During the meeting, Gazzola testified that the two agreed that

Brandt would restore the '59 Porsche in exchange for title to the '62 Porsche, plus an additional sum of $4,000 to $5,000 "to cover any parts or expenses that [Brandt] might have had while working on the car."

On May 6, 2001, the parties executed a two page letter agreement on the letterhead of Brandt's sole proprietorship, Euro-Classics Automobiles ("ECA").[5] The agreement contained vague and ambiguous terms.  It is unclear from Gazzola's testimony which party drafted the final agreement.  Gazzola testified, however, that both parties agreed on the final language after exchanging drafts with each other. The agreement provided a detailed list of the work to be performed by ECA on the '59 Porsche which was to be "restored mechanically and visually to approximate an original vehicle and will be in condition to drive."  It also provided that Gazzola would transfer ownership of the '62 Porsche to ECA when "$8,000 has been expended in the restoration of the ['59 Porsche]." Under the heading "Compensation," the agreement provided:

> To compensate ECA for the work on the ['59 Porsche], and to cover costs of parts and services, [Gazzola] is transferring ownership of his ['62 Porsche], and all parts and accessories that are currently for sale.  This car is currently not running and has had some restoration work performed.  The value of this vehicle is agreed to be eight thousand dollars ($8,000).

> In addition, the sum of four to five thousand dollars ($4,000 - $5,000) will be paid incrementally over the year's time the ['59 Porsche] car will be worked on.  The $4-5,000 ($12-13,000 including the coupe) estimate is non-binding.  The owner will approve any additional work or expenses.  If payments do not keep pace with the work, work will be suspended and time will be added to the agreed upon period.

---

[5] ECA and Brandt are used interchangeably herein unless otherwise specified.

> The estimate includes hours for mechanical work, body work, tracking and/or finding parts, pickup and delivery of vehicles, and any time involved in obtaining necessary parts (drive to pick up).

The above provision regarding the payment of $4,000-$5,000 did not specify when the payments were to begin or which party was required to make them, but Gazzola testified he agreed to pay such amounts to cover Brandt's expenses for working on the '59 Porsche and that he anticipated that he would make the payments after a "demonstrable amount of work [had been] done."  Lastly, the agreement provided that both vehicles would be garaged at ECA's place of business at 215 Underpass Road and that "Work under this agreement will be performed within approximately one year after the signing by both parties."

Gazzola testified that within a week of signing the agreement, an employee of Brandt took both cars, including all parts, from his home and brought them to ECA in Brewster, Massachusetts.  He testified that just prior to delivery of the cars to Brandt, he completed a separate, one page inventory for each car detailing the respective parts contained in each vehicle.  Gazzola did not deliver the inventories to Brandt until a few months after the parties executed the agreement.  *See* Exhibits 2 and 3.  With respect to the '59 Porsche inventory, the list consisted of more than 50 parts and accessories related to the engine, body, and various mechanical systems and related hardware.  Gazzola estimated the current value of all parts given to Brandt at between $20,000 and $25,000. Gazzola testified that all parts were given to Brandt in 2001 as part of the agreement as "he wanted both the cars and all parts."

Following the delivery of the cars to Brandt, Gazzola called him several times to check on the progress of his work, and he visited the ECA shop during 2001 at which time he determined that no work had been done.  After one visit in September 2001, Gazzola recounted the lack of progress: "I noticed that my car was still sitting there gathering dust and no work had been done on it."  From 2001 to 2006, Gazzola testified, both cars remained in Brandt's possession.  He maintained that Brandt repeatedly avoided his telephone calls.  When he was able to speak to Brandt about the status of the restoration, Gazzola testified that "[he] continually said to me that he would begin it soon enough and I felt confident that [he] would and it inspired me to, to keep up with it."  He added that he believed Brandt because the two had a contract and that he thought he had no alternative but to believe him.

From 2001 through 2006, Gazzola testified that he contacted Brandt many times by phone, made approximately ten visits to the shop, and also supplied Brandt with additional auto parts for the job, including chrome wheels and tires.  During these visits, Gazzola observed that "there was obviously little or no work done to the cars . . . nor any of the other work that had been promised."  He maintained that Brandt offered many excuses for his failure to perform the work, including the press of other business, a death in the family, and an ongoing zoning dispute with the Town of Brewster.  Despite the litany of excuses, Gazzola persisted in his belief that Brandt would complete the job.  He testified that he relied on Brandt's promises to do so.  During the period of 2001 through 2006, Gazzola asserted that he had no more than visual access to his cars and was unable to use, sell or enjoy them.

Gazzola testified that in March 2006 Brandt informed him that he did not want to complete the restoration because he had not yet received title to the '62 Porsche. During that time, according to Gazzola, Brandt asked him whether he would be interested in selling the '59 Porsche to a potential buyer who had seen it at ECA. Gazzola testified that he told Brandt that he was not interested in selling that car and wanted to adhere to the terms of the agreement.

In 2007, Gazzola testified, he continued to make personal visits to ECA to speak with Brandt. At all times, Brandt maintained he intended to honor the agreement and would do so after engaging a general manager. Gazzola asserted that he relied on Brandt's representations. Gazzola testified that he visited ECA in June 2007 and spoke to an employee, Paul Howard, about the lack of performance of the agreement. According to Gazzola, Howard reported to him that the shop had been robbed and the two looked for parts that had been left in Brandt's care but could not locate them among the numerous other parts at the shop. Gazzola said that, as far as he knew, there was no police report for the incident and that when he followed up with Brandt about the robbery, he replied that there was nothing he could do.

Gazzola met with Brandt in October 2007 at which time, he testified, he met a new employee named Dawn Adamovitch who promised that she would send him pictures of the '59 Porsche on a monthly basis to show the progress of the restoration. Despite Ms. Adamovitch's representation, Gazzola testified that he never received a single photograph. Following another in-person meeting between Gazzola and Brandt, Gazzola sent Brandt a letter dated November 9, 2007, with copies of a trade publication reflecting

recent valuations of the '62 Porsche.  Gazzola testified that the value of that car, in

restored condition, had increased "astronomically" from the $8,000 that he had originally

asked for the car.  The tone of the letter was friendly and optimistic:

> Peter, It was good to talk with you the other morning and finding you not
> only in a good mood but getting your tools ready to work on my car.  That
> also makes me happy.  Things seem to be taking a change for the better.
> Life is moving along and the motor is humming.
>
> <div align="center">***</div>
>
> [The appreciation of the '62 Porsche] will be good for both of us and then
> we can have a nice dinner . . . before I drive my car home.

Gazzola's optimism was not well-founded.  By 2008, Gazzola testified that he had

finally, after seven years, lost patience with Brandt and retained counsel, Attorney Craig

Nickerson of Orleans, Massachusetts.  On August 19, 2008, over seven years after the

execution of the agreement, Attorney Nickerson sent Brandt a letter demanding that he

comply with the terms of the parties' agreement.  Notwithstanding the demand, Gazzola

testified, Brandt still failed to complete the restoration project, and again told Gazzola

that he would finish the job when he had time.  Four months later, on December 29, 2008,

Attorney Nickerson sent Brandt a formal demand letter pursuant to the Massachusetts

consumer protection statute, Mass. Gen. Laws ch. 93A (the "93A Letter"), through which

he sought return of both vehicles and alleged that Brandt had, among other things, failed

to comply with the terms of the parties' agreement and failed to preserve parts for both

Porsches.

On January 16, 2009, Brandt responded to the 93A Letter by sending his own letter

directly to Gazzola through which he asserted that over $8,000 of restoration work had

been performed on the '59 Porsche, that Gazzola had failed to honor his obligation to

transfer ownership of the '62 Porsche to him, and that Gazzola had hampered his work by his abrasive communications with his staff.  In an effort to settle the matter, Brandt proposed that he would accept Gazzola's tender of $8,131.63 for parts purchased and work performed in exchange for releasing both vehicles to Gazzola.  Additionally, he asserted that he would "waive" accrued storage fees incurred for the '62 Porsche in the amount of $18,630.  Notwithstanding the assertions in the letter, Brandt provided no evidence at trial that he performed any work on the '59 Porsche, that he purchased any parts for either vehicle or that ECA was entitled to storage fees.  Indeed, Gazzola testified that he did not receive a bill from Brandt until 2010, well after Gazzola had engaged counsel.  As stated above, Brandt asserted no counterclaims in this proceeding seeking offsets for storage fees or parts.

The parties continued to exchange correspondence but were unable to resolve their dispute.  On August 17, 2010, Gazzola initiated the state court action against Brandt, d/b/a ECA, by filing a two count complaint with the Orleans District Court, through which he asserted one count for breach of contract and one count for violation of Mass. Gen. Laws ch. 93A.

The District Court conducted a trial on the merits and, as stated above, issued the Memorandum and Judgment on September 13, 2012 and a separate Judgment on September 14, 2012.  In the Memorandum and Judgment, the court noted that the '59 Porsche was returned to Gazzola pursuant to its order dated January 24, 2011, although many of its parts were missing.  In its ruling, the District Court determined that the value of the '62 Porsche was $8,000 and that Brandt did some work on the '59 Porsche but

"nothing like $8,000 worth of work was ever done on it during the next decade, let alone the one year specified in the contract." The District Court indicated that Gazzola failed to adequately support his opinion of the value of the missing auto parts.  The District Court offset the nominal value it attributed to the services performed by Brandt ($100) with the nominal value of the missing parts of the '59 Porsche ($100) and ruled: "Brandt's conduct in holding both vehicles for a decade doing little work on the '59 [Porsche] but attempting to force Gaz[z]ola to pay him money to which he was not entitled was an unfair and deceptive act in violation of GL c. 93A, § 2" for which treble damages were warranted based on Brandt's "willful and knowing" violation of ch. 93A, §2.  The District Court also ruled that the '62 Porsche, including all parts delivered by Gazzola, constituted property of Brandt and that he was entitled to retain possession of them.

As set forth in the separate Judgment, the District Court awarded Gazzola damages of $8,000 trebled to $24,000, prejudgment interest of $5,993.06, costs of $195 and attorney's fees of $12,600 (totaling $42,788.06).  Also, as noted above, Gazzola obtained the execution two weeks later, on September 27, 2012, which included postjudgment interest of $183, resulting in a total execution amount of $42,971.06 through such date. Gazzola testified that no appeal was ever filed in the state court action.

Gazzola testified in this Court that he never transferred title to the '62 Porsche to Brandt and never paid the $4,000 to $5,000 for the additional parts contemplated by the agreement or any other sum, although he stated that he did supply additional parts to Brandt, including wheels and tires, in 2005 or 2006.  He also testified that when he retrieved the '59 Porsche from ECA, it was essentially only a "rolling chassis . . . and a

few extraneous used parts" consisting of a muffler affixed to the engine, a windshield frame and four wheels, "but that everything else was missing." He maintained that other than those parts, the remaining items on the '59 Porsche inventory were not returned to him.

Brandt introduced no evidence that any work had been performed on the '59 Porsche or that parts were returned to Gazzola when the District Court ordered the turnover of the car. Gazzola also introduced into evidence pictures of the '59 Porsche taken in 2012, one of which reflected the interior of the car which contained a steering wheel, two seats, various bumper parts and a cardboard box of extraneous parts. The pictures clearly show that the '59 Porsche had not been restored "mechanically and visually" as was called for by the agreement. As stated above, Gazzola sold the '59 Porsche in 2014, and he testified that he sold it because "the loss of all the parts that were necessary to repair it and the cost of replacing those parts and finishing the restoration . . . put me in a position that I couldn't manage it financially."

The parties stipulated in the Joint Pretrial Memorandum that Gazzola levied on the execution on May 2, 2014 and proceeded with a sheriff's sale of Brandt's real estate, presumably 215 Underpass Road as reflected in the SOFA.

## IV.    POSITIONS OF THE PARTIES

### A. Gazzola

Gazzola asserts entitlement to judgment under Count I of the Complaint (§ 523(a)(2)(A)) based upon the Debtor's knowing misrepresentations, on which he justifiably relied, and based upon the Debtor's actual fraud. He argues that any damages

assessed by this Court should be trebled, relying on <u>Cohen v. de la Cruz</u>, 523 U.S. 213, 118 S. Ct. 1212 (1998), and that he is also entitled to attorney's fees and costs.   He asserts entitlement to judgment under Count II (§ 523(a)(4)) as a result of the Debtor's embezzlement, namely the Debtor's fraudulent conversion of his automobiles and parts. Additionally, he maintains that the Court should draw an adverse inference against the Debtor due to his failure to testify at trial, citing <u>Nichols v. McGohan (In re McGohan)</u>, 75 B.R. 10, 13 (Bankr. N.D.  N.Y. 1986) ("As bankruptcy adversary proceedings are civil proceedings, an adverse inference may be drawn against a party when they refuse to testify in response to probative evidence offered against them.").

B. <u>The Debtor</u>

With respect to Count I, the Debtor maintains that Gazzola failed to establish that he made any misrepresentations or engaged in any fraud either at the time the parties executed the agreement or at the time Gazzola delivered the vehicles to ECA. Accordingly, he argues, the debt owed to Gazzola was not "obtained by" any fraudulent conduct of the Debtor as required by § 523(a)(2)(A).   With respect to any misrepresentations made by him subsequent to 2001, the Debtor asserts that Gazzola proved no damages from any reliance on them and that any such reliance was unjustified given Gazzola's level of experience with Porsche restoration jobs.  Likewise, he asserts that Gazzola failed to establish that he converted the automobiles or their parts for his own use or any use inconsistent with Gazzola's rights.  Finally, the Debtor argues that the Court cannot draw an adverse inference against him for his failure to testify as he

appeared at the trial and was available to testify, citing <u>Bogosian v. Woloohojian Realty</u>

<u>Corp.</u>, 323 F.3d 55 (1st Cir. 2003).

## V.   DISCUSSION

### A. <u>Adverse Inference</u>

At the outset, the Court notes that although the Debtor did not testify in his own

defense, he did attend the trial and was available to testify if Gazzola had called him as a

witness.  In <u>Bogosian v. Woloohojian Realty Corp.</u>, 323 F.3d 55 (1st Cir. 2003), the United

States Court of Appeals for the First Circuit observed:

> The "missing witness" rule permits, rather than compels, the factfinder to
> draw an adverse inference from the absence of a witness, *see* <u>Niziolek v.</u>
> <u>Ashe</u>, 694 F.2d 282, 292 (1st Cir. 1982), particularly where the factfinder
> concludes that the party who requested the adverse inference failed to
> subpoena a witness otherwise available to testify, *see* <u>Trump Plaza Assocs.</u>
> <u>v. Poskanzer (In re Poskanzer)</u>, 143 B.R. 991, 998 (Bankr. D. N.J. 1992).

<u>Bogosian,</u> 323 F.3d at 67.  Given the presence and availability of the Debtor at trial, his

participation in the filing of the Joint Pretrial Memorandum in which he listed himself as

a potential witness, and the failure of Gazzola to call the Debtor as a witness at trial, the

Court declines to draw the suggested adverse inference from the Debtor's failure to

testify.  Nevertheless, the Court concludes that Gazzola was a credible witness and his

testimony was unrebutted, as the Debtor did not testify in his own defense.

### B. <u>Applicable Law -- § 523(a)(2)(A) and (a)(4)</u>

Section 523(a)(2)(A) and (a)(4) provide:

> (a) A discharge under section 727 . . . of this title does not discharge an
> individual debtor from any debt—. . .

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition; . . .

(4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny; . . .

11 U.S.C. § 523(a)(2)(A) and (a)(4).

The standard of proof of each element of an exception to discharge is by a preponderance of the evidence. Palmacci v. Umpierrez, 121 F.3d 781, 787 (1st Cir. 1997) (citing Grogan v. Garner, 498 U.S. 279, 291, 111 S. Ct. 654 (1991)). The burden of proof and the burden of production as to each element rests with the party contesting the dischargeability of a particular debt under Bankruptcy Code § 523. Palmacci, 121 F.3d at 787.

C. Effect of the Memorandum and Judgment

With respect to the Memorandum and Judgment, the Court determines that it has limited preclusive effect in this adversary proceeding.  "'Under the full faith and credit statute, 28 U.S.C. § 1738, a judgment rendered in a state court is entitled to the same preclusive effect in federal court as it would be given within the state in which it was rendered.'" Silva v. Massachusetts, 351 F. App'x 450, 457–58 (1st Cir. 2009) (quoting Giragosian v. Ryan, 547 F.3d 59, 63 (1st Cir. 2008), cert. denied, 556 U.S. 1184, 129 S. Ct. 2020 (2009)).  "'Massachusetts recognizes two distinct types of preclusion arising out of the maintenance of prior litigation: res judicata (claim preclusion) and collateral estoppel (issue preclusion).'" Silva, 351 F. App'x at 458 (quoting Andrew Robinson Int'l, Inc. v.

Hartford Fire Ins. Co., 547 F.3d 48, 52 (1st Cir. 2008)). According to the First Circuit in

Silva,

> [T]he Supreme Judicial Court recently stated that issue preclusion applies
> when (1) there was a final judgment on the merits in the prior adjudication;
> (2) the party against whom preclusion is asserted was a party (or in privity
> with a party) to the prior adjudication; and (3) the issue in the prior
> adjudication was identical to the issue in the current adjudication.
> Additionally, [4] the issue decided in the prior adjudication must have been
> essential to the earlier judgment.  Massachusetts courts also require that [5]
> appellate review must have been available in the earlier case before issue
> preclusion will arise.

Silva, 351 F. App'x at 458–59 (citations omitted).

The third element of issue preclusion, namely whether the issue in this adversary

proceeding is identical to the issue tried in state court is missing here.   "Chapter 93A

requires a showing of conduct that (1) falls within the 'penumbra of some common-law,

statutory, or other established concept of unfairness'; (2) is 'immoral, unethical,

oppressive, or unscrupulous'; and (3) causes 'substantial injury to [consumers or other

business persons].'" Jasty v. Wright Med. Tech., Inc., 528 F.3d 28, 37 (1st Cir. 2008)

(quoting Serpa Corp. v. McWane, Inc., 199 F.3d 6, 15 (1st Cir. 1999), (and citing PMP

Associates, Inc. v. Globe Newspaper Co., 366 Mass. 593, 321 N.E.2d 915, 918 (1975))

(internal quotation marks omitted).  These elements differ from and are not sufficient to

sustain a cause of action under 11 U.S.C. § 523(a)(2)(A) and (a)(4).  *See* this Court's Order

dated June 17, 2016, denying Gazzola's motion for summary judgment.

The Memorandum and Judgment, however, would be binding on this Court with

respect to the determination of the debt owed by the Debtor should this Court determine

that Gazzola has sustained his burden of proving an exception to discharge under §

523(a)(2)(A) or (a)(4) through the evidence introduced at trial. *See* Wilmers v. Yeager (In re Yeager), 500 B.R. 547, 555–56 (Bankr. S.D. Ohio 2013), *aff'd*, Yeager v. Wilmers, 553 B.R. 1NP02 (S.D. Ohio 2015), *aff'd*, (6th Cir. July 19, 2016) (quoting Chandler v. Alexakis (In re Alexakis), Adv. Pro. No. 11-3164, 2012 WL 10716047, at *6 (Bankr. S.D. Ohio Sept. 9, 2009), (noting that: "[p]ursuant to the doctrine of res judicata or claim preclusion as well as *Rooker–Feldman* principles, this court cannot revisit the Debtor's liability for the judgment debt nor the amount of damages awarded to the [plaintiff] by the state court as those matters have been conclusively determined in the State Court Judgment[.]"). The issue for this Court to determine then is whether the debt arising out of the Memorandum and Judgment is excepted from discharge under § 523(a)(2)(A) and/or (a)(4).

D. Count I—11 U.S.C. § 523(a)(2)(A)

To establish that a debt is excepted from discharge under § 523(a)(2)(A) because it was "obtained by - false pretenses, a false representation, or actual fraud," a creditor must show that 1) the debtor made a knowingly false representation or one made in reckless disregard of the truth, 2) the debtor intended to deceive, 3) the debtor intended to induce the creditor to rely upon the false statement, 4) the creditor actually relied upon the misrepresentation, 5) the creditor's reliance was justifiable, and 6) the reliance upon the false statement caused damage. McCrory v. Spigel (In re Spigel), 260 F.3d 27, 32 (1st Cir. 2001) (citing Palmacci v. Umpierrez, 121 F.3d 781, 786 (1st Cir. 1997)). Liability under § 523(a)(2)(A) is not limited to misrepresentations. *See* Husky Int'l Elec., Inc. v. Ritz, __ U.S. __, 136 S. Ct. 1581, 1586 (2016) ("actual fraud" in § 523(a)(2)(A) encompasses forms of fraud, like fraudulent conveyance schemes, that can be effected without a false

representation; anything that counts as "fraud" and is done with wrongful intent is "actual fraud").

The Court finds that Gazzola failed to establish by a preponderance of the evidence that the Debtor obtained possession of the vehicles, and their constituent parts, in 2001, by means of false pretenses, false representations or actual fraud.   Indeed, the parties' relationship at the time they entered into the agreement was based on little more than a one-time meeting at which Gazzola reviewed photos produced by the Debtor depicting a vintage car restoration.  Gazzola did not establish that the Debtor made any false representations, created any false impressions or engaged in any fraudulent conduct during their meeting or during their subsequent exchanges of draft contracts.  Although there is some inferential support for the conclusion that the Debtor may have entered into the agreement with Gazzola for the purpose of stripping the vehicles for parts and/or selling them to a third party, the Debtor did not establish that such intention was manifest at the inception of the parties' contractual relationship.  It is equally plausible that the Debtor did intend to complete the work when Gazzola originally entrusted the vehicles to him, notwithstanding the numerous questionable excuses he offered over the ensuing years for his inability to do so.  *See* deBenedictis v. Brady-Zell (In re Brady-Zell), 756 F.3d 69, 72 (1st Cir. 2014) ( "When the weight of the evidence is in equipoise, a party cannot plausibly be said to have carried the devoir of persuasion.").

To the extent Gazzola asserts that the debt to him arose due to his reliance on the Debtor's varied excuses from 2001 through 2008, when he finally engaged counsel, the Court concludes that such reliance was not justified. To constitute justifiable reliance, a

plaintiff's conduct does not have to "'conform to the standard of the reasonable man[, as]
[j]ustification is a matter of the qualities and characteristics of the particular plaintiff, and
the circumstances of the particular case, rather than of the application of a community
standard of conduct to all cases.'" Field v. Mans, 516 U.S. 59, 70–71, 116 S.Ct. 437 (1995)
(quoting Restatement (Second) of Torts § 545A cmt. b).  Furthermore, "a person is justified
in relying on a representation of fact 'although he might have ascertained the falsity of
the representation had he made an investigation.'" Id. at 70 (quoting Restatement
(Second) of Torts § 540). "Justifiability is not without some limits," however, as "a person
is 'required to use his senses, and cannot recover if he blindly relies upon a
misrepresentation the falsity of which would be patent to him if he had utilized his
opportunity to make a cursory examination or investigation.'" Id. at 71, (quoting
Restatement (Second) of Torts § 541, cmt. a).

At the outset of the parties' relationship, the Debtor simply maintained that he was
too busy to complete the work.  Later, he maintained that a death in the family, staffing
issues, an on-going zoning dispute with the Town of Brewster, and a robbery, for which
he produced no police report, prevented him from performing the restoration.  The
evolving nature of the Debtor's excuses over an extended period of time, as well as his
efforts to avoid Gazzola's phone calls support the conclusion that the Debtor made
misrepresentations.  These ever changing excuses continued unabated for nearly seven
years before Gazzola finally took legal action.  Despite Gazzola's numerous visits to ECA
over the years, there is no indication in the record that he made even a cursory
examination or investigation to verify the veracity of statements made by the Debtor and

his agents.   The reliance of Gazzola, a sophisticated car enthusiast, on the Debtor's misrepresentations cannot be said to have been justified under the circumstances, especially when he personally witnessed the lack of progress on the '59 Porsche during his numerous visits to the shop.  The Debtor's gamesmanship should have been obvious; Gazzola blindly relied on the Debtor's misrepresentations and continued to deliver automobile parts to the Debtor as late as 2006.  He placated him in an effort to get the job done as reflected in the content and tone of the letter he sent to the Debtor in 2007, six years after delivery of the vehicles.

For the above stated reasons, the Court finds that Gazzola did not sustain his burden under § 523(a)(2)(A).  Accordingly, the Court shall enter judgment in favor of the Debtor on Count I of the Complaint.

E. <u>Count II-- 11 U.S.C. § 523(a)(4)</u>

Embezzlement is not defined in § 523 or elsewhere in the Bankruptcy Code. The United States Court of Appeals for the First Circuit, in the context of § 523(a)(4), defined embezzlement as "'the fraudulent conversion of the property of another by one who is already in lawful possession of it.'" <u>Sherman v. Potapov (In re Sherman)</u>, 603 F.3d 11, 13 (1st Cir. 2010) (relying on <u>Neder v. United States</u>, 527 U.S. 1, 23, 119 S. Ct. 1827 (1999), and quoting <u>United States v. Young</u>, 955 F.2d 99, 102 (1st Cir. 1992)). "Thus, to amount to embezzlement, conversion must be committed by a perpetrator with fraudulent intent[.]" <u>Sherman</u>, 603 F.3d at 13. "It is knowledge that the use is devoid of authorization, scienter for short, <i>see</i> <u>Palmacci v. Umpierrez</u>, 121 F.3d 781, 786 (1st Cir. 1997), that makes the conversion fraudulent and thus embezzlement[.]" <u>Sherman</u>, 603 F.3d at 13.

"'Embezzlement accordingly requires proof that (i) property in the perpetrator's lawful possession but (ii) belonging to another (iii) was appropriated by the perpetrator in a manner inconsistent with the property rights of the other and the scope of his or her authorization to deal with the property (iv) with fraudulent intent." Matthews v. Nealon (In re Nealon), 532 B.R. 412, 424 (Bankr. D. Mass. 2015) (quoting Reiss v. McQuillin (In re McQuillin), 509 B.R. 773, 785 (Bankr. D. Mass. 2014)).

"Under Massachusetts law, '[w]here the wording of the contract is unambiguous, the contract must be enforced according to its terms.'" Liberty Mut. Ins. Co. v. Gibbs, 773 F.2d 15, 17 (1st Cir. 1985) (quoting Edmonds v. United States, 642 F.2d 877, 881 (1st Cir.1981)). Alternatively, if a court finds that the language used in a contract is either patently or latently ambiguous, it can consider extrinsic evidence as to the parties' intent. In re Inofin, Inc., 455 B.R. 19, 38 (Bankr. D. Mass. 2011) (citing Coffin v. Bowater Inc., 501 F.3d 80 (1st Cir. 2007)). The parties' agreement was vague and ambiguous with respect to some terms, such as the timing of certain payments and the timing of the transfer of title to the '62 Porsche. The agreement, however, was unambiguous with respect to the time period during which the Debtor was to complete the work, i.e., "approximately one year" and the standard for completion, namely "restor[ation] mechanically and visually to approximate an original vehicle . . . in condition to drive." The Court credits Gazzola's testimony that the cash payment was to be made "to cover any parts or expenses" that might have arisen while the Debtor worked on the car and that such work was never performed. The agreement and other evidence supports that the value of the '62 Porsche was $8,000 at the time the parties entered into the agreement.

The '62 Porsche was determined by the District Court in 2012 to be the property of the Debtor. Accordingly, this Court will only consider here whether the Debtor embezzled the '59 Porsche and its parts. The Court finds Gazzola sufficiently established that the Debtor was, pursuant to the terms of the agreement, rightfully in possession of Gazzola's property, the '59 Porsche and its parts, for a period of approximately one year for the limited purpose of completing a restoration project. Indeed, Gazzola continued to insure the car from 2001 to 2012 in expectation of its ultimate return. Notwithstanding the parties' agreement, the Debtor impermissibly retained possession of the vehicle beyond the agreed term for nearly ten years until he was finally ordered by the District Court to return it to Gazzola in 2011. Gazzola's credible and unrebutted testimony, as well as the photos introduced into evidence, sufficiently establish that the Debtor's prolonged possession of the vehicle was inconsistent with the terms of the entrustment as he did no restoration work on the '59 Porsche during this time and returned it to Gazzola with numerous missing parts.

The Debtor's fraudulent intent is established by circumstantial evidence provided through Gazzola's testimony. When Gazzola inquired about the lack of progress on the project and the missing parts, the Debtor gave a litany of excuses and, at one point, implausibly claimed to have been robbed. When Gazzola called the Debtor about the progress of the restoration job, the Debtor repeatedly avoided his calls. When Gazzola made formal demand for both cars through counsel, the Debtor asserted a baseless setoff claim for storage fees, a claim he did not assert in this proceeding. In the nearly ten years the Debtor possessed the '59 Porsche, he completed no work on it and pilfered its

parts.  He advanced no legitimate reason for his retention of the car while he deprived Gazzola of its use without compensation.  The Court concludes that, at some point after he took possession, the Debtor removed parts from the vehicle, appropriated them for his own use or sale and returned the skeletal "rolling chassis" to the Debtor only when ordered to do so by the District Court.  Even had the Debtor's return of the '59 Porsche to Gazzola been volitional, the return does not eliminate the element of fraudulent intent.  *See* Savonarola v. Beran, 79 B.R. 493, 496 (Bankr. N.D. Fla. 1987) (intention to only temporarily deprive creditor of their property "does not eliminate the inference of intent" for purposes of § 523(a)(4)); Moonan v. Bevilacqua (In re Bevilacqua), 53 B.R. 331, 334 (Bankr. S.D. N.Y. 1985) (holding that even though debtor intended to use the funds only temporarily, plaintiff was deprived of his property and the resulting conversion constitutes embezzlement for purposes of § 523(a)(4)); Applegate v. Shuler (In re Shuler), 21 B.R. 643, 644 (Bankr. D. Idaho 1982) ("The fact that the intent is to deprive the rightful owner of the funds only temporarily and not permanently . . . does not eliminate the element of intent.").

The Court finds that Gazzola has established by a preponderance of the evidence that the Debtor misappropriated the '59 Porsche and its parts with fraudulent intent.  All of the elements for embezzlement under § 523(a)(4) having been satisfied by Gazzola, the Court shall enter judgment in his favor under Count II of the Complaint.

F. <u>The Debt</u>

As discussed above, to determine the amount of the debt owed to Gazzola which is excepted from discharge, this Court is bound by and must start with the Memorandum and Judgment, notwithstanding that it includes an award of treble damages, attorney's fees and interest. *See* <u>Cohen v. de la Cruz</u>, 523 U.S. 213, 118 S. Ct. 1212 (1998) (discharge exception under § 523(a)(2)(A) prevents the discharge of all damages arising from the debtor's fraud, including treble damages assessed under state law, attorney's fees and costs, and any other relief that might exceed the value obtained by the debtor in connection with the fraudulent conduct). Courts have applied the reasoning of <u>de la Cruz</u> to other subsections of § 523(a). *See* <u>Correia-Sasser v. Rogone (In re Correia-Sasser)</u>, No. ADV 2:10-1632-RJH, 2014 WL 4090837, at *13 (B.A.P. 9th Cir. Aug. 19, 2014) (observing that the <u>de la Cruz</u> Court read § 523(a)(2)(A) in *pari materia* with other exception to discharge sections, including § 523(a)(4)); <u>MacArthur Co. v. Cupit (In re Cupit)</u>, 514 B.R. 42, 55 (Bankr. D. Colo. 2014), *aff'd*, 541 B.R. 739 (D. Colo. 2015) (relying on <u>de la Cruz</u> and ruling that once a debt has been determined to be nondischargeable under § 523(a)(4), all of the ancillary obligations which are a part of that debt, including treble damages and interest, are also nondischargeable).

Having determined that the Judgment obtained by Gazzola is excepted from discharge, the amount of the debt collectable from the Debtor may include postjudgment interest accrued after the date of the Memorandum and Judgment to which he is or may be entitled under state law, subject to any setoffs for amounts recovered by Gazzola through the sheriff's sale and/or through plan distributions in the bankruptcy case. *See*

26

<u>Leeper v. Pennsylvania Higher Educ. Assistance Agency, (PHEAA)</u>, 49 F.3d 98 (3d Cir.

1995) (court, relying on <u>Bruning v. United States</u>, 376 U.S. 358, 84 S. Ct. 906 (1964), ruled

that interest may accrue against a debtor personally, as opposed to the bankruptcy estate,

on nondischargeable student loans while bankruptcy case is pending).  The <u>Leeper</u> court

observed that the reasoning of <u>Bruning</u>, which involved the accrual of post-petition

interest on a nondischargeable tax debt, has been applied to other types of

nondischargeable debts, including debts for fraudulent misrepresentations under §

523(a)(2)(A), and ruled that the "mere accrual of post-petition interest does not violate

the automatic stay."  <u>Id</u>. at 101-02, 104.  *See also* <u>In re Augé</u>, 559 B.R. 223 (Bankr. D. New

Mexico 2016) (the nondischargeable character of a debt affects the post-petition interest

rate, and even though a creditor's allowed claim against the estate can be limited to the

federal judgment rate, it likely would be entitled to collect post-petition interest at the

higher state judgment rate against the debtor personally).  <u>Id</u>. at 230 (and cases cited).

## V.    CONCLUSION

For the above stated reasons, the Court shall enter a judgment against Gazzola and

in favor of the Debtor on Count I and a judgment in favor of Gazzola and against the

Debtor on Count II of the Complaint.   To the extent Gazzola seeks attorney's fees in

addition to those awarded to him in the Memorandum and Judgment, the request is

denied as he has advanced no statutory basis for this Court to award additional attorney's

fees to a creditor in a successful § 523 proceeding.  *See* 11 U.S.C. § 523(d) (allowing an

award of attorney's fees and costs to a *debtor* where a creditor seeks an exception to

discharge under § 523(a)(2) for a consumer debt which is determined to be dischargeable).

A separate order shall enter.

By the Court,

Joan N. Feeney

Dated: March 20, 2017